595 So.2d 619 (1992)
Eldon CHERAMIE
v.
J. WAYNE PLAISANCE, INC. and T. Baker Smith & Son, Inc.
No. 91 C 1779.
Supreme Court of Louisiana.
March 2, 1992.
*620 Michael Osborne, Christopher Gobert, Osborne, McComiskey & Gobert, New Orleans, for applicant.
Robert L. Picou, Jr., Maginnis & Picou, Kenneth Blake Givens, Houma, for respondent.
Nathalie M. Walker, Professor Oliver A. Houck, New Orleans, for amicus curiae, Louisiana Wildlife Federation.
WATSON, Justice.
The issue is whether the employer of plaintiff Cheramie violated the Louisiana Environmental Quality Act in discharging Cheramie.

FACTS
Defendants, J. Wayne Plaisance, Inc. and T. Baker Smith & Son, Inc., entered a contractual Joint Venture on the Isles Dernieres Stabilization Project for the Louisiana Department of Transportation and Development (DOTD). The Isles Dernieres barrier island system consists of three uninhabited islands five miles off the coast of Terrebonne Parish, Louisiana. The islands are described as the East, Central and West or Last Island.
The Project was designed to stabilize the islands between Raccoon Point and Wine Island by restoring the dunes and washover areas and filling in the breaches. An artificial dune measuring approximately 110 feet wide and five feet high was to be constructed with fill from Lake Pelto and Caillou Bay. The contract was in three phases totaling $1,499,700. A map of the area is shown below:
*621 
The contract required an assessment of environmental effects. A key part of this assessment was a description of the habitat, its animals and any endangered or threatened species. The assessment was included in Phase I of the contract but was scheduled and completed after the initial surveys.
Ted Joannen, a biologist with the Louisiana Department of Wildlife and Fisheries, has headed the brown pelican program in Louisiana since 1968. Because the native brown pelicans had disappeared, young birds were imported from Florida. In 1984, fifty birds were placed on the Isles Dernieres chain, an original nesting site of brown pelicans. The part of West Island where the birds were released is owned by the state of Louisiana. The fledglings were ten to twelve weeks old and had to be fed and nursed until they could fly. Pelicans mature in three years. In 1987, Joannen was delighted to see adult brown pelicans on Raccoon Point of West Island. There was a nesting attempt by the birds, which required solitude.
On May 22, 1987, Joannen received a report that the pelicans had abandoned their nest. Joannen contacted the Project Manager, Marc Rogers, and asked that the Joint Venture's workers stay off West Island until the damage could be assessed. Rogers agreed. On May 25, Rogers sent a letter to the DOTD confirming the agreement.
Joannen testified that a helicopter visited the island on May 26. The brown pelicans had abandoned their nest, the gulls had eaten the eggs and there were no live young. Survey tracks and flags and people tracks were present throughout the colony. However, it was hoped that the pelicans might re-nest if they were left alone.
Cheramie worked for the Project as an instrument man on a survey crew. His crew chief was John Robichaux. When Cheramie first visited West Island in the middle of May, he saw two or three brown pelicans and thousands of other birds, nests and eggs. His crew was driving an all-terrain four wheeler and pulling a wagon. They damaged a lot of nests and eggs. Cheramie expressed concern about the damage to Robichaux. Cheramie had learned on a previous survey job involving an eagle's nest that endangered species must be protected. Subsequently, Cheramie complained to regulatory officials about the damage, although his employer was apparently unaware of Cheramie's communications. Cheramie said he was attempting to discover if the surveying work on West Island was permitted.
On June 1, 1987, shortly after Rogers said the Joint Venture's workers would stay off the island, all four of its crews were mobilized to finish the work on West Island. The most probable explanation is found in Cheramie's quotation of Robichaux: "trying to complete it before they received papers stating not to go back on that particular island." (TR. 165).
On June 1, 1987, Cheramie's crew boarded a crew boat in Cocodrie, which took them to a quarter boat five or ten miles from the islands. Robichaux told Cheramie they were going to Raccoon Point on West Island. Cheramie was reluctant; he said the proposed work was illegal and asked *622 for alternate work. Robichaux told Cheramie he had no choice, go or be fired. Cheramie was fired at approximately 8:30 A.M. All of the other surveyors went to West Island. Shortly afterward, the DOTD called and instructed the Joint Venture to vacate West Island. About 10:30 A.M., the four crews were diverted to Central Island. Cheramie waited at the quarter boat until the crews returned from the day's work.
John Joseph Plaisance II, president of J. Wayne Plaisance, Inc., testified that Cheramie had worked for the company in 1985 and 1986, and on this job in 1987. John Plaisance said Cheramie, a good worker, was fired for refusing to work on West Island. Plaisance understood that Cheramie was concerned about the legality of the work. The West Island work was completed that fall.
A June 4, 1987, internal memo to Rogers states: "it appears that Mr. Cheramie was the one who first called the Fish & Wildlife and told them we were on the island destroying the eggs." (TR. 55).
William K. Mellor, a special agent with the United States Fish and Wildlife Service, testified by deposition that he received a complaint from Cheramie that the Joint Venture was disturbing nesting brown pelicans on West Island, in violation of the Endangered Species Act. Agent Mellor went to the island several times, once with Cheramie. He observed that all-terrain vehicles had traveled over nesting areas, destroying nests containing eggs and young birds. Members of a work crew admitted that they had rolled over some birds.
As a result of Mellor's investigation, a federal grand jury convened. Mellor recommended prosecution of the Joint Venture to the United States Attorney. The United States Fish and Wildlife Service was not aware of the DOTD's Project, which required a federal permit.
Cheramie was paid $6.00 an hour. In 1986, Cheramie had reported income of $7,014 and $3,248 in unemployment benefits. In 1987, he was paid $3,804.50 and compensation of $1,016. Before his discharge, Cheramie had been laid off but never fired. After he was fired, he was unsuccessful in getting another job, despite repeated applications. His truck was repossessed. He felt threatened. Some members of his family said he had made a mistake. Dr. Walter Birdsol of Galliano prescribed Xanax, an anti-anxiety drug.
Dr. Birdsol referred Cheramie to a clinical psychologist, Dr. Rafael Salcedo, for psychological evaluation. A Minnesota Multiphasic Personality Inventory (MMPI) indicated that Cheramie was experiencing internal stress and turmoil. The validity scale on Cheramie's MMPI profile revealed an open, straightforward attitude, without exaggeration or denial. Dr. Salcedo diagnosed Cheramie as having a depressive reaction to the stressful experience. The charge for three office visits, evaluation and testing was $240. Cheramie was unable to afford the further treatment recommended by Dr. Salcedo.
The trial court dismissed plaintiff's suit, holding that Cheramie was fired for refusing to work and not for reporting an environmental violation. The court of appeal affirmed, holding that wildlife protection is not the type of "environmental statute, ordinance, or regulation" contemplated by LSA-R.S. 30:2027(B). Cheramie v. J. Wayne Plaisance, Inc., 583 So.2d 921 (La. App. 1st Cir.1991). A writ was granted to review the judgment of the court of appeal. 588 So.2d 91 (La.1991).

LAW
Louisiana Constitution Article IX, § 1, provides: "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The Legislature shall enact laws to implement this policy." The Louisiana Environmental Quality Act, LSA-R.S. 30:2001 through 30:2396, is a legislative response to this constitutional imperative. The Act seeks: "to preserve, protect, and enhance the quality of the environment in Louisiana." LSA-R.S. 30:2003(B).
*623 Before its amendment in 1991, LSA-R.S. 30:2027 stated:
A. No firm, business, private or public corporation, partnership, individual employer, or federal, state, or local governmental agency shall act in a retaliatory manner against an employee, acting in good faith, who reports or complains about possible environmental violations.
B. Any employee against whom any action is taken as a result of reporting or complaining of a violation of any state, federal, or local environmental statute, ordinance, or regulation may commence a civil action in a district court of the employee's parish of domicile, and shall recover from his employer triple damages resulting from the action taken against him and all costs of preparing, filing, prosecuting, appealing, or otherwise conducting a law suit, including attorney's fees, if the court finds that Subsection A of this Section has been violated. In addition, the employee shall be entitled to all other civil and criminal remedies available under any other state, federal, or local law.
(1) The term "action is taken" shall include firing, layoff, lockout, loss of promotion, loss of raise, loss of present position, loss of job duties or responsibilities, imposition of onerous duties or responsibilities, or any other action or inaction the court finds was taken as a result of a report of an environmental violation.
(2) "Damages" for the purposes of this Section shall include, but not be limited to, lost wages, lost anticipated wage due to wage increase, or loss of anticipated wages which would have resulted from a lost promotion, any property lost as a result of lost wages, lost benefits, and any physical or emotional damages resulting therefrom.
C. This Section shall have no application to any employee who, acting without direction from his employer or his agent, deliberately violates any provision of this Subtitle or of the regulations, or permit or license terms and conditions in pursuance thereof.
While the Louisiana Environmental Quality Act deals primarily with protection of the state's air and water, LSA-R.S. 30:2021 recognizes that environmental concerns include the state's fish and wildlife. LSA-R.S. 30:2021(B) states, in part:
The Department of Wildlife and Fisheries shall have the responsibility to review and comment on any environmental impact statements relative to fish and wildlife resources or their habitat....
LSA-R.S. 30:2011(A)(1) provides that the Department of Environmental Quality's regulation is "not limited to" protection of the state's air and water.
The Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544, provides protection for endangered species of wildlife. The Act declares that preservation of endangered species is of "esthetic, ecological, educational, historical, recreational, and scientific value...." 16 U.S.C. § 1531. Congress has given protection of endangered species the highest priority. TVA v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Destroying the habitat of an endangered bird violates the Endangered Species Act. Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir.1987). Altering the habitat of an endangered species during construction activities requires a permit. City of Las Vegas v. Lujan, 891 F.2d 927 (D.C.Cir. 1989).

CONCLUSION
The trial judge stated that "Cheramie refused to go to work on the Western Isle. He stated that he would be willing to do any other job, but no other job was available. Plaintiff was fired at this point, because of his refusal to perform the only work available to him." (TR. 76).
The trial court was clearly wrong in finding that the only work available was on West Island. Shortly after Cheramie's discharge, all of the Project's survey personnel were transferred to Central Island. Everyone but Cheramie was sent to other work: other work was obviously available.
Judge Shortess correctly stated in his court of appeal dissent: "Cheramie was fired because he exercised his constitutional *624 right to free speech by telling his supervisor and employer that the activities they were about to engage in were illegal." 583 So.2d at 926.
Refusal to participate in illegal and environmentally damaging work is an extreme form of complaint, and constitutes "complaining" under LSA-R.S. 30:2027(B).
Prior to its 1991 amendment, LSA-R.S. 30:2027(B) covered complaints about violations of "any state, federal, or local environmental statute, ordinance, or regulation." If the scope of LSA-R.S. 30:2027 had been limited to violations of the Louisiana Environmental Quality Act, it could not have included violations of local and federal laws. The court of appeal erred in restricting the statute's application to violations of the Louisiana Environmental Quality Act. That interpretation is contrary to the terms of LSA-R.S. 30:2027 and the intent of the Act as a whole.
Stabilization of these barrier islands was a worthwhile project, but it could have been scheduled without endangering the state's attempt to restore the brown pelicans. In fact, the Project was completed when the danger to the birds' nesting grounds passed. The brown pelican remains a threatened and endangered species.
Cheramie was fired because he complained about his employer's intention of violating state and federal law by continuing operations in a protected area without a permit. The Joint Venture, through Rogers, had agreed to defer the work but violated its written commitment. Cheramie complained to the point of refusing to participate in the action and, as the trial judge found, he was fired because he refused to do that particular work. Cheramie's discharge entitles him to damages under LSA-R.S. 30:2027.
For the foregoing reasons, the judgment of the court of appeal is reversed and the case is remanded to the court of appeal for calculation of the damages due plaintiff under LSA-R.S. 30:2027, and entry of a judgment against the defendants, J. Wayne Plaisance, Inc. and T. Baker Smith & Son, Inc.
REVERSED AND REMANDED.