United States Court of Appeals,

Fifth Circuit.

No. 96-30138.

Norman M. POWERS, Plaintiff-Appellee, Cross-Appellant,

v.

VISTA CHEMICAL COMPANY, Defendant-Appellant, Cross-Appellee.

April 11, 1997.

Appeal from the United States District Court for the Western District of Louisiana.

Before POLITZ, Chief Judge, and WIENER and STEWART, Circuit Judges.

STEWART, Circuit Judge:

This case presents the question of whether Vista Chemical Company violated Louisiana's environmental whistleblower statute (La. R.S. 30:2027 (West Supp.1996)) by firing Norman M. Powers in retaliation for Powers's disclosure of an environmental violation. Powers was terminated after he stormed out of a meeting in which he disclosed environmental violations to his supervisor at Vista. It was uncontradicted that approximately two weeks prior to the meeting with Powers, Vista had already reported the environmental violation to the United States Environmental Protection Agency and Louisiana's Department of Environmental Quality (DEQ); Vista had already obtained identical information about the violation from Powers's co-workers; Vista did not take any adverse action against any of Powers's co-workers; Vista never advised Powers to withhold information from the environmental authorities; and Vista did not take any adverse action against Powers for anything he said to the DEQ. At the same time, Powers admitted that abruptly leaving the

meeting with his supervisor (in which he cursed at the supervisor) was grounds for discharge. Under these facts, Powers's case was submitted to a jury, who returned a verdict in Powers's favor. Pursuant to § 2027, the jury awarded Powers $504,000 (after damages were trebled), which was remitted to $369,000.

Vista moved for judgment as a matter of law, arguing that § 2027 required Powers to prove that his disclosure must have motivated Vista to terminate him, and that the evidence did not support such a finding. The district court denied the motion, reasoning that § 2027 did not require a showing of illicit motivation and that, "unfortunately for Vista," Powers's disclosure happened to concern the environment.

Finding that § 2027 does require a showing of motivation and that therefore the district court erred in denying Vista's post-trial motion for judgment as a matter of law, we REVERSE. Because we also find that the evidence was insufficient to support a finding of illicit motivation, we RENDER judgment for Vista.

BACKGROUND

The defendant, Vista Chemical Company (Vista), is a large petrochemical plant, and Vista hired the plaintiff, Norman M. Powers, in 1991. Vista's Rules of Conduct, which Powers signed, provided that Vista employees may be fired at any time for, among other things, insubordination.

In 1992, Powers worked in a "Quench Unit," which uses oil-based liquids to manufacture Vista's products. The solid waste generated from Vista's manufacturing process is dumped into

concrete-lined sand filters. Vista's permit from Louisiana's DEQ allows Vista to dump the waste in the sand filters provided the materials have a "low flashpoint" (i.e., the materials do not ignite at a temperature below 140 °F). The flashpoint level can only be determined through laboratory testing, not by sight or smell. Once the waste is dumped into the sand filters, Vista further processes the waste. Whatever is left over is then taken to a hazardous waste landfill (to Chem Waste Management), which customarily tests the waste for flashpoint levels.

On October 13-14, 1992, one of Vista's operators pumped solid waste into the sand filters. On October 15, 1992, Powers loaded 40,000 pounds of waste from the filters into a truck bound for Chem Waste. Although Vista's shipments had never before tested positive for a low flashpoint, the October 15 shipment did. Chem Waste immediately notified Vista. Vista then conducted its own tests and confirmed that the October 15 shipment did indeed test positive for a low flashpoint. By early afternoon on October 15, 1992, Vista realized that it had violated the terms of its DEQ permit. By October 16, 1992, Vista had notified the various state and regional divisions of the DEQ and the Environmental Protection Agency that waste dumped into Vista's sand filters tested positive for a low flashpoint. On October 16, Vista assembled a four-person team to investigate the incident. Jim Lewing was a member of that team.

On October 19, DEQ inspectors made an unannounced visit to Vista's plant. The purpose of the visit was to determine how low-flashpoint material made its way into the sand filters and

3

what, if anything, Vista was doing to prevent that from happening again. Lewing's subordinate instructed Powers to accompany the DEQ inspectors because Powers was on duty when the lowflashpoint material was shipped to Chem Waste. Powers was instructed to truthfully answer questions posed by the DEQ. During DEQ's visit, Powers did not complain about any environmental problems or violations.

At the same time, on October 19, Lewing prepared eight standard questions he would ask the operators who would be questioned in connection with the investigation of the incident. Question 4 stated the following: "When did you find the solvent on the sand filters[?]" According to Vista, on October 19 and 20, Lewing questioned various operators, including Powers, who had worked in the sand filter area on or about October 15. In response to Question 4, one operator told Lewing that the solvent had been there "approximately three weeks"; another operator said that the sand filters "always" contained solvent; and a third operator allegedly told Lewing that the solvent problem existed for "several weeks." None of these operators were ever told to change their story with regard to the existence of low-flashpoint solvent on the sand filters and none were fired as a result of their disclosures. According to Vista, Powers told Lewing that he found low-flashpoint solvent in the sand filters "last Thursday, October 15, 1992, or last Wednesday." Lewing took notes during the meeting that reflected the operators' responses to Question 4. At this point, Lewing believed that operator error caused low-flashpoint material

4

to enter the sand filters.

At trial, Powers denied that an October 19 meeting with Lewing ever took place and denied that he responded to Question 4 in the manner that Lewing claimed. The parties also disagree about what happened after the alleged October 19 meeting between Lewing and Powers.

According to Vista, on October 27, Lewing began a customary second round of interviews with the operators who had knowledge of the October 15 incident. Lewing testified that all of the operators provided Lewing with essentially the same responses, with one exception—Powers. Vista claims that at the second interview, conducted about one mile from Lewing's office (at the press building), Powers changed his story and stated that solvent had been on the sand filters several months earlier. Lewing then became frustrated with Powers's changed story and went back to his office. Lewing summoned Powers to his office. After further questioning, Powers abruptly got up and walked out of the meeting, saying "I don't have to put up with this crap...." Powers was allegedly fired for his insubordinate conduct at the meeting.

Powers admitted that his conduct at the meeting was grounds for discharge. Powers also admitted that neither Lewing nor anyone else at Vista (1) told Powers to withhold information from the EPA or DEQ, (2) took any action against Powers "for anything [he] said" or any "report [he] gave" the DEQ, or (3) told Powers to cover up the environmental violations. The DEQ concluded that Vista was helpful and cooperative and that Vista was not attempting to cover

5

up the environmental violations.

Powers story is slightly different.  He claims that the first meeting he had with Lewing occurred on October 27, not October 19, when Lewing approached him at the press building.  When asked when he first saw the solvent in the sand filters, Powers responded that it had been there since Powers first began working in the sand filter area (i.e., for months).  Powers claims that at that point Lewing "kind of exploded" and said that Powers was lying.  Powers denied the allegation and repeated his claim that the solvent had been there for months.  At that point, Powers testified that Lewing threatened Powers by saying the following:  "Look, ... you are just a green hat out here, and ... you are going to say any damn thing I want you to say, or I am going to run your ass out the gate."

Without any citation to the record, Powers claims that he "was of the impression that Jim Lewing wished to intimidate him into saying that the October 15th incident was just a three day [*sic* ] problem."  Powers claims that Lewing then abruptly left.  After being summoned to Lewing's office, Powers reiterated his claim that the low-flashpoint solvent had been in the sand filters for months, to which Lewing allegedly yelled, hit the desk, accused Powers's of lying, and said that he would run his "ass out the gate." According to Powers, Lewing sought to ensure that Lewing's version of the cause of the accident—operator error—went unchallenged. Powers sums up the evidence as follows:

> [T]he "party line" on October 27, 1992, to which Jim Lewing was attempting to force adherence, was that it was operator error, in order that Lewing could assert that the violation had just been on the sand filter impoundments for just a day

or so, not two months or longer. This is certainly a credible interpretation of the evidence, which leads one to the conclusion that Jim Lewing's actions against plaintiff were to retaliate against him for disclosing the longer term problem.

PROCEDURAL HISTORY

Powers filed suit against Vista claiming that he was fired in retaliation for disclosing that the low-flashpoint solvent was in the sand filters for weeks to months, not just a few days. The jury found that Vista violated Louisiana's whistleblower law and awarded Powers $168,000, which, pursuant to the statute, was trebled to $504,000. Powers was also awarded attorneys' fees.

At the close of Powers's case and after the jury returned its verdict, Vista moved the district court for judgment as a matter of law, arguing that the evidence was insufficient to support Powers's claim that Vista terminated him in violation of the whistleblower statute. In the alternative, Vista asked for a remittitur. The district court, although it found that there was insufficient evidence to show that Vista was motivated by "environmental reasons," nonetheless denied Vista's motion, concluding that "unfortunately for Vista," the disagreement between Lewing and Powers happened to concern the environment. However, the district court ordered Powers to accept a remittitur to $369,000 or face a retrial on all issues. Powers accepted the remittitur. Vista timely appealed and Powers cross-appealed.

STANDARD OF REVIEW

We must determine whether the district court erred when it denied Vista's motion for judgment as a matter of law at the close of the evidence and after the jury returned its verdict. "The

7

standard of review of a denial of a motion for judgment as a matter of law depends on whether the defendant has properly preserved the issue by moving for judgment as a matter of law at the conclusion of all of the evidence." *See Polanco v. City of Austin,* 78 F.3d 968, 973-74 (5th Cir.1996) (citing *Bunch v. Walter,* 673 F.2d 127, 130 n. 4 (5th Cir.1982)). Here, Vista moved for judgment as a matter of law at the close of the evidence.

Accordingly, we analyze the sufficiency of the evidence to determine whether a reasonable jury could have come to the conclusion that it did. *Id.* at 974. "We will reject a verdict in those instances when, despite considering all the evidence in the light and with all reasonable inference most favorable to the verdict, we find no evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial discretion could arrive at the same conclusion." *Thrash v. State Farm Fire & Cas. Co.,* 992 F.2d 1354, 1356 (5th Cir.1993) (quotations omitted). Of course, we review *de novo* the district court's conclusions of law.

DISCUSSION

I. THE MEANING OF LOUISIANA'S ENVIRONMENTAL WHISTLEBLOWER STATUTE

This case presents an issue of first impression for the Fifth Circuit and Louisiana attorneys. We must decide the meaning of Louisiana's environmental whistleblower statute, codified at La. R.S. 30:2027 (West Supp.1996). Because we sit in diversity, we are mindful of our duty to interpret the law as would a Louisiana court. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.

8

1188 (1938). In making an *Erie* guess, we have said that "[w]e are emphatically not permitted to do merely what we think best; we must do that which we think the [Louisiana] Supreme Court would deem best." *Jackson v. Johns-Manville Sales Corp.,* 781 F.2d 394, 397 (5th Cir.) (en banc), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986).

With that said, we begin with the statute. Louisiana's environmental whistleblower statute provides in part:

> A. No firm, business, private or public corporation, partnership, individual employer, or federal, state, or local governmental agency shall *act in a retaliatory manner* against an employee, acting in good faith, who does any of the following:
>
> (1) *Discloses,* or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation.
>
> * * * * * *
>
> B. (1) Any employee against whom any action is taken as a result of acting under Subsection A of this Section may commence a civil action ... and shall recover from his employer triple damages resulting from the action taken against him....

La. R.S. 30:2027 (emphasis added).

The parties both argue that the term "discloses" in § 2027 is unambiguous and supports their respective positions. Powers argues that the language of § 2027 is plain—it covers "disclosures" regardless of the economic or other consequences that may flow from such a disclosure. He contends, and the district court agreed, that any other reading of the statute would produce absurd consequences. "Under defendant's reading of the statute," argues

9

Powers, "if twenty employees learned of an environmental violation and disclosed it to their supervisor, only the first would be protected and the other nineteen could be terminated with impunity, as nothing new was being disclosed." Vista, on the other hand, contends that the plain language of § 2027 supports its position. Vista argues that the term "discloses" should be interpreted from the perspective of the employer. "[I]t makes no sense," asserts Vista, "to view the word "discloses' from the standpoint of the employee ... because the plaintiff cannot free himself from secrecy or ignorance by telling something."

We do not find, however, that this case turns on the meaning of "discloses" in § 2027. We assume, without deciding, that Powers's statements to his supervisor were disclosures protected by § 2027. Instead, we must decide what it means for an employer to "act in a retaliatory manner" after an employee discloses or threatens to disclose an environmental violation. The district court concluded that Powers was not required to show that his disclosure motivated Vista to terminate him. Stated differently, the district court was of the view that under § 2027, an employer can retaliate against an employee for disclosing an environmental violation even though the employer is not motivated by the disclosure to take the adverse employment action. We must determine whether the district court was correct in so concluding.

We hold that to retaliate within the meaning of § 2027 requires a showing of illicit motivation. Section 2027 was enacted

10

in 1981 and amended in 1991,[1] and we deal here with the amended §

2027. However, neither the Louisiana Supreme Court nor any

intermediate appellate courts within Louisiana have interpreted the

amended version of § 2027. Nor have we found any legislative

history that sheds light on the issues in this case. Louisiana

courts have, however, interpreted the predecessor to § 2027, and we

find these decisions helpful in our determination of the meaning of

the phrase "act in a retaliatory manner" in § 2027.

In *Cheramie v. J. Wayne Plaisance, Inc.,* 595 So.2d 619

(La.1992), the Louisiana Supreme Court, interpreting the pre-1991

version of § 2027 (which contained the identical retaliation

language), held that an employee fired for refusing to do illegal

work that is damaging to the environment is entitled to damages

under § 2027. *Id.* at 624. The court reasoned that § 2027 provided

relief for the plaintiff because "he complained about his

employer's intention of violating state and federal law by

continuing operations in a protected area without a permit." *Id.*

Similarly, in *Bartlett v. I.D. Reese,* 569 So.2d 195

(La.Ct.App. 1st Cir.), *writ denied,* 572 So.2d 72 (La.1991), the

Louisiana Court of Appeals held that the precursor to § 2027,

which, as in *Cheramie,* contained the same "retaliation" language as

the current version of § 2027, is triggered because the employee

was fired because he reported an environmental violation. *Id.* at

200-02. In reaching this conclusion, the court of appeals noted

---

[1]The relevant portions of the 1981 version of § 2027 protected "*reports* or *complain[ts]* about possible environmental violations." (Emphasis added.)

11

that the reported environmental violation had potentially adverse economic consequences for the company (in the form of cancellation of a contract). *Id.* at 201, 202.

The construction of § 2027 in *Cheramie* and *Bartlett* comports with the common-sense meaning of the word "retaliate." The dictionary defines "retaliate" as "to return like for like; ... to return evil for evil; pay back injury for injury; ... to return an injury, wrong ... for (an injury, wrong ... )...." WEBSTER'S NEW WORLD DICTIONARY at 1145 (3d College ed.1994); *see, e.g., Sumrall v. Luhr Bros.,* 665 So.2d 796, 800 (La.Ct.App. 1st Cir.1995) (looking to *Black's Law Dictionary* for common and approved usage), *writ denied,* 669 So.2d 425 (La.1996). Plainly, for an employer to retaliate against an employee, the employer must be *motivated* (i.e., form a subjective intent) to take adverse employment action in return for the perceived "wrongful" conduct of the employee.[2] In both *Cheramie* and *Bartlett,* the employer fired the employee *because* the employee committed the "wrong" of whistleblowing—by refusing to do a job that would have been in violation of environmental laws (*Cheramie* ) and by reporting an unreported environmental violation (*Bartlett* ).

Although *Cheramie* and *Bartlett* involved interpretations of the pre-1991 version of § 2027, we nonetheless conclude that the Louisiana Supreme Court would hold that the meaning of the phrase "act in a retaliatory manner" in § 2027 requires a showing that the

---

[2]The dictionary defines "motive" as "some inner drive, impulse, intention, etc. that causes a person to do something or act in a certain way...." WEBSTER'S, at 886.

12

employer was motivated to fire an employee because of the employee's disclosure of an environmental violation. Otherwise, § 2027 would be transformed into a wrongful-discharge statute which covers adverse employment actions that have nothing to do with an employee's disclosure of an environmental violation—a result inconsistent with Louisiana's employment at-will doctrine. *See* La. C.C. art. 2747 (West 1996); *Stevenson v. Lavalco, Inc.,* 669 So.2d 608, 610 (La.Ct.App.2d Cir.1996). As such, we conclude that the district court erred in finding that § 2027 does not require an employee to prove that an employer's adverse employment action was motivated by the employee's disclosure of an environmental violation.

## II. SUFFICIENCY OF THE EVIDENCE

Because we have concluded that § 2027 requires a showing of illicit motivation, we now turn to the evidence to determine whether it is sufficient to support the jury's conclusion that Powers was terminated in violation of § 2027.[3] We note at the

---

[3]The parties spent a great deal of energy arguing over the propriety of the jury instructions. The jury was told that to recover under § 2027, Powers's disclosure had to be "a determinative factor" in Vista's decision to terminate him. Vista argued strenuously that the statute requires a showing that the disclosure was the "sole" or "the substantial determinative" factor in Vista's decision.

We decline to address this issue because it is unnecessary to the resolution of this case. As we discuss in the text, we have found that the record does not support a finding that Powers's environmental disclosure motivated Vista to fire him. Given the facts of this case, providing a precise definition of "motivation" (in the form of a § 2027 jury instruction) would not only be unwise, but is precisely the type of exercise we feel is best left to the Louisiana Supreme Court and intermediate courts of appeals.

13

outset that the district court, when ruling on Vista's post-trial motion for judgment as a matter of law, concluded that the evidence was insufficient to support the conclusion that Powers was fired for "environmental reasons" and that the evidence relating to the "retaliation factor" posed a "bothersome issue." The district court nonetheless denied Vista's motion because the disagreement between Lewing and Powers, "unfortunately for Vista," happened to concern the environment.

Our independent review of the record persuades us that the evidence was simply insufficient to support a finding that Vista was motivated to terminate Powers because he disclosed to supervisor Lewing that the low-flashpoint material was on the sand filters for several months. At trial, Vista produced a wealth of evidence to this effect. Powers admitted at trial that (1) Vista did not tell him to withhold any information from the environmental authorities investigating the Vista incident, (2) Vista did not take any action against him "for anything [he] said" or any "report [he] gave" the DEQ, (3) Vista took no adverse action against his co-workers (who made similar disclosures to Lewing), and (4) his abrupt exit from his meeting with Lewing and accompanying curse was grounds for discharge. In addition, the information Powers claims was the basis for his retaliatory discharge—that low-flashpoint materials were on the sand filters for months—had already been disclosed to Vista approximately two weeks before Powers's disclosure and two weeks prior to Vista's report to the EPA and DEQ that Vista had violated one of the terms of its environmental

14

permit.

We have carefully searched the record for evidence that Vista fired Powers in retaliation for disclosing that low-flashpoint materials were on the sand filters for more than two or three days. We have found precious little that is directly relevant to the issue of whether Powers's disclosure motivated Vista to fire him. Indeed, the only relevant evidence presented by Powers on this point was the alleged aggressive behavior of supervisor Lewing in his meeting with Powers. But this evidence too cannot give rise to an inference of § 2027 retaliation absent evidence suggesting that Vista was motivated to terminate Powers on the basis of the environmental disclosure. The record is devoid of any such evidence.

Powers is simply mistaken when he asserts that his disclosure to Lewing that the low-flashpoint material was on the sand filters for a few months motivated Vista's decision to terminate him. From the point of view of Vista, the length of time the flammable material was on the sand filters was inconsequential because Vista had already informed the DEQ that Vista did not know how long the materials were on the sand filters. There was no, as Powers seems to think, "party line" to which Vista was trying to force adherence. Ron Cady, the DEQ inspector, was asked by Powers's attorney on cross-examination whether "the solvent material had been on the sand filters for a period of time in excess of just one or two days?" Cady responded that Vista "said they didn't know."

In other words, Vista was not attempting to mislead the

15

environmental authorities about the length of time the flammable materials remained on the sand filters. In fact, the uncontradicted evidence showed that a representative of the DEQ believed that Vista was not trying to cover anything up. Precisely the opposite was true: Vista exhibited "total cooperation," was "very helpful," and "at no time did [the DEQ representative] feel like anybody involved in the investigation felt like Vista was trying to conceal anything from us." In light of these facts as well as Vista's knowledge (gleaned from other employees) about the possibly lengthy presence of the material on the sand filters, Powers failure to present any evidence suggesting that his disclosure could have motivated Vista's decision to terminate Powers is fatal to his claim that Vista violated § 2027.[4]

We conclude that the meager evidence presented by Powers on the issue of whether Powers's disclosure motivated Vista to terminate him is insufficient to support a finding of liability under § 2027. Rather, the record is insufficient to support a jury

---

[4]Powers contends that his disclosure that the low-flashpoint material was on the sand filters for a few months raised the specter of harsher penalties from the DEQ. Powers characterizes the testimony as follows: "If this is a one time [*sic* ] spill or upset event, DEQ approaches the penalty to be imposed differently than if it was a situation which had been going on for a long period of time, and one which someone should have recognized and addressed." We have reviewed the relevant portions of the record and conclude that Powers presented no evidence suggesting that Lewing was covering up the alleged two-month (or more) problem to avoid harsher DEQ penalties. We agree with the district court's interpretation of the evidence that "the probable reason for Mr. Lewing's displeasure with Mr. Powers" was that Powers's account tended to discredit Lewing's conclusions about what had occurred, "not because of any concern that [Lewing] or, for that matter, Vista, had for the environmental people."

16

verdict that Powers's disclosure of an environmental violation to his supervisor was any kind of motivating factor, whether sole, substantial, or simply one of several. In fact, the only jury verdict that the evidence is sufficient to support is that Vista fired Powers for his insubordinate conduct in the meeting with supervisor Lewing.

## CONCLUSION

Because we find error in the district court's conclusion that Powers was not required to prove that Vista's decision to terminate him was motivated by a desire or intention to retaliate against him for his environmental disclosure, we REVERSE the district court's denial of Vista's post-trial motion for judgment as a matter of law. Because we further find that, even if there had been a jury instruction on retaliatory motive, the evidence is in sufficient to support a finding of illicit motivation, we RENDER judgment for Vista.

REVERSED AND RENDERED.

17