813 So.2d 1156 (2002)
Joseph P. BROWN, et al.
v.
CATALYST RECOVERY OF LOUISIANA, INC.
No. 01-1370.
Court of Appeal of Louisiana, Third Circuit.
April 3, 2002.
*1158 Michael T. Tusa, Jr., Kelly M. Rabalais, LeBlanc, Tusa & Butler, LLC, Metairie, LA, Counsel for Defendant/Appellant Catalyst Recovery of Louisiana, Inc.
William W. Goodell, Jr., Lafayette, LA, Counsel for Plaintiffs/Appellees John Kevin Aubrey, Troy Sampey Aubrey, Joseph P. Brown, McKinley LeBlanc & Mitchell David Richard.
Stephen B. Murray, Stephen B. Murray, Jr., Murray Law Firm, New Orleans, LA, Counsel for Plaintiffs/Appellees John Kevin Aubrey, Troy Sampey Aubrey, Joseph P. Brown, McKinley LeBlanc & Mitchell David Richard.
Court composed of HENRY L. YELVERTON, ULYSSES GENE THIBODEAUX, and OSWALD A. DECUIR, Judges.
THIBODEAUX, Judge.
This is a wrongful termination case, grounded in La.R.S. 30:2027, wherein plaintiffs, Joseph Brown and McKinley LeBlanc, allege wrongful termination in retaliation for reporting OSHA confined space entry violations. Defendant, Catalyst Recovery of Louisiana, Inc., alleges that the plaintiffs were legitimately terminated for sleeping on duty, in violation of company policy. The trial judge found for the plaintiffs and awarded emotional distress damages to each and lost wages to Mr. Brown which damages were trebled pursuant to La.R.S. 30:2027(B). Both plaintiffs were awarded attorney fees and costs. Catalyst's appeal followed.

I.

ISSUES
We shall consider whether the trial court erred in:
(1) refusing to allow Catalyst to redirect its own witness during its case in chief;
(2) refusing to allow introduction and consideration of the past disciplinary record of Mr. Joseph Brown;
(3) refusing to allow Catalyst to present evidence related to Mr. Joseph Brown's possible mitigation of damages;
(4) concluding that plaintiffs carried their burden of proving under La. R.S. 30:2027 that Catalyst terminated them for disclosure of an environmental violation;
(5) awarding emotional distress damages to Mr. McKinley LeBlanc;
(6) its award of attorney fees;
(7) awarding excessive costs; and,
(8) its award of interest.

*1159 II.

FACTS AND PROCEDURAL HISTORY
Catalyst Recovery of Louisiana, Inc. (hereinafter "Catalyst") is a business serving refineries and chemical manufacturing facilities. The plant operates 24 hours per day, seven days a week. Crews work 12 hour shifts, making chemical wastes reusable by cooking them in up to four industrial grade oven units. The wastes, which can be toxic and hazardous, are often handled by Catalyst's production operators. For the recovery process to be successful, the units must operate at extremely high temperatures and, periodically, they must be manually cleaned.
The units qualify as "confined spaces" and when hazardous materials are present, unit entry is regulated by the Occupational Health and Safety Administration (OSHA) in three principal ways. First, before a worker may enter a confined space where these materials have been processed, the environment must be tested for hazardous materials. Second, a permit must be posted at the confined space entry, indicating hazardous materials are within acceptable amounts. Finally, a hole watch must be assigned to monitor the safety of the worker entering the confined space.
Mr. Joseph Brown and Mr. McKinley LeBlanc are former Catalyst production personnel. Mr. Brown was a crew supervisor and Mr. LeBlanc was one member of that crew. This case is rooted in their allegations of wrongful discharge.
At April and July 1996 safety meetings, concerns were voiced to plant manager Mr. Tim Stafford and others that OSHA confined space regulations were not being complied with. Mr. Stafford testified that he emphatically stated that permits and hole watchers must be present at the units. However, employee-operators Mr. Brown and Mr. John Aubrey testified that the two meetings did not prompt any member of the Catalyst management to investigate the confined space concerns. Former Catalyst employee, Mr. Curtis Darby, testified that prior to August 1996, Catalyst rarely complied with the confined space requirements of a hole watch and of a permit. Mr. Bradford Cormier, the production operator, testified that he did not even know what a confined space permit was.
According to Mr. Aubrey's testimony, on August 15, 1996, shift supervisor Mr. Adam Derise twice ordered him to enter and clean the Unit IV Regenerator without the OSHA-required permit and hole watch. Upon entering the confined space the first time, Mr. Aubrey was apparently overcome by heat and fumes and collapsed. After Mr. Aubrey recovered, Mr. Derise ordered him in once more. Again, Mr. Aubrey was overcome by heat and fumes and collapsed. He sought medical treatment from an emergency room doctor on August 16 and then later, by the Catalyst company doctor.
Mr. Mitchell Richard, who had been assigned to clean Unit II that same night, corroborated Mr. Aubrey's testimony. Mr. Aubrey added that in his opinion, refusing reentry the second time would have amounted to an act of insubordination. He was fearful of losing his job.
Mr. Stafford launched an investigation into the August 15 incident. Even though Mr. Aubrey told Mr. Stafford that Mr. Derise had ordered him into the unit, Mr. Stafford explained that Mr. Aubrey would be suspended from work. Mr. Stafford did not launch an investigation into Mr. Richard's confined space violation of that same night.
On August 21, 1996, Mr. Aubrey contacted OSHA to report routine confined space violations. On August 23, Mr. Aubrey was *1160 called into the plant office and was terminated for violating company policy. Mr. Stafford testified that he terminated Mr. Aubrey for three reasons: first, that he entered the unit without a confined space entry permit; second, that he made a second entry into the unit without a confined space entry permit; and third, that ignoring a direct order from Mr. Derise not to enter the unit was an act of insubordination. Mr. Stafford testified further, however, that neither Mr. Derise nor Mr. Aubrey told him that Mr. Derise had ordered Mr. Aubrey either to enter or not to enter the unit.
According to the deposition of Mr. Aaron Youngs, Mr. Derise instructed him to be Mr. Aubrey's hole watch on the night of August 15. When Mr. Aubrey began cleaning the unit, however, Mr. Derise instructed Mr. Youngs to run an errand. When Mr. Aubrey overheated and exited the unit the first time, Mr. Derise instructed Mr. Youngs to continue cleaning in Mr. Aubrey's place. Mr. Youngs testified in deposition that when Mr. Aubrey reentered, Mr. Youngs served as his hole watch. When Mr. Aubrey exited the second time and returned home, Mr. Youngs and Mr. Derise finished cleaning the unit, each serving as hole watchers for one another. At no point, according to the testimony of Mr. Youngs, was there a confined space permit posted.
The next day, on August 16, Mr. Youngs testified that he was instructed by Mr. Derise that when speaking to OSHA representatives, he was to explain that Mr. Aubrey entered the unit voluntarily, that Mr. Youngs was to be the hole watch, but that Mr. Aubrey did not wait for his hole watch before entering the unit. After speaking with OSHA representatives, Mr. Youngs provided a written statement in the presence of Mr. Stafford. Mr. Youngs testified that Mr. Stafford was dissatisfied with the statement and asked Mr. Youngs to issue a new one, wherein he was to explain that Mr. Derise had no knowledge that Mr. Aubrey planned to enter the unit without either a permit or a hole watch. The refined statement was submitted to OSHA in connection with its September 1996 investigation of the August 15 incident. At the conclusion of the investigation, Catalyst was not cited for confined space violations. Mr. Stafford threw away Mr. Youngs' original statement.
Mr. Youngs testified in deposition that he agreed to draft the second statement in order to placate Mr. Stafford, primarily because he relied upon his employment with Catalyst. Moreover, because Mr. Youngs lacked a high school diploma, he believed that production manager Mr. Francis Dautreuil had overlooked a diploma as a prerequisite to employment. Eventually, after being certified in connection with confined spaces and after feeling disrespected at work, Mr. Youngs contacted OSHA in February 1997 and gave a new statement, consistent with his original version of what happenedthat he was removed from hole watch, that he was ordered to continue cleaning in Mr. Aubrey's place, and that there was no confined space permit posted.
In February 1997, OSHA commenced a second investigation, which Mr. Youngs believed was in response to his having contacted OSHA. However, Mr. Stafford testified that the second investigation was a result of Mr. Aubrey having pressed his case to OSHA again after the original finding of no violation. In any event, the agency interviewed several other Catalyst employees, including Mr. Brown, Mr. LeBlanc, and Mr. Richard. They all reported to OSHA that they knew of employees who had been required to enter a permit-required confined space without a permit or without a hole watch. Also, they all *1161 stated that they had a certain degree of fear of losing their jobs if they spoke to or discussed any such violations with OSHA. All three men agreed that, at the time the statements were given (i.e., after the August 15 incident), confined space entry procedures were being followed. On March 31, 1997, OSHA issued citations to Catalyst for confined space entry violations. On that same day, upon Mr. Stafford's recommendation, both Mr. Brown and Mr. LeBlanc received merit raises, along with the other employees sharing the same job category. Catalyst settled the OSHA matter in April 1997 and paid a fine.
On April 2, 1997, Mr. Brown, Mr. LeBlanc, Mr. Richard, and Mr. Youngs testified under oath at Mr. Aubrey's unemployment hearing. It was then that Mr. Youngs explained having submitted the original false statement to OSHA at Mr. Stafford's instruction. The next month, in May 1997, Mr. Youngs was accused of sexually harassing a female employee and was terminated. He denied inappropriate conduct in connection with that employee.
On July 20, 1997, Ms. Wendy Duhon saw both Mr. Brown and Mr. LeBlanc sleeping on duty. She reported that Mr. Brown slept in his chair for about 15 minutes. On that same night, she saw Mr. LeBlanc sleeping as well, for over 30 minutes. She spoke to Mr. Dautreuil, who told her that if she were to see it happen again, she should wake them if the sleeping extended beyond their allotted break time.
In response to the incident, Mr. Brown was counseled by Mr. Dautreuil that sleeping on duty was an unacceptable violation of company policy. Because Mr. Brown was Mr. LeBlanc's direct supervisor, Mr. Dautreuil asked Mr. Brown to counsel Mr. LeBlanc about the incident. Mr. Dautreuil testified that he did not intend for the matter to be handled as a formal disciplinary action under Catalyst's disciplinary procedures. He viewed the sleeping as "unintentional." Mr. Stafford testified that he thought it was probably true, and he had no record to the contrary, that this was the first time in the history of the plant that an employee had been reprimanded for sleeping on duty.
On July 29, Mr. Derise was served with a copy of Mr. Aubrey's wrongful discharge lawsuit. On the night of July 29, Mr. Brown and his crew, including Mr. LeBlanc and Mr. Richard, began their twelve-hour night shift at 8:00 p.m. The crew took its first 15 minute break between 10:00 p.m. and 11:00 p.m., then took its 30 minute lunch break around midnight.
In the early hours of July 30, 1997, at approximately 3:00 a.m., the crew took its final break. Crew member Mr. Spencer Brackin left the break room at approximately 3:30 a.m. when the rest of the men had fallen asleep. Mr. Luther Pride, maintenance supervisor, arrived at the plant at approximately 4:00 a.m. to begin his shift. He saw Mr. LeBlanc, Mr. Brown, Mr. Richard, and Mr. Jackson asleep in the break room and at approximately 4:20 a.m., Mr. Pride took photographs of the sleeping men. After calling Mr. Stafford for instruction, Mr. Pride woke them up and sent them home pending an investigation. Mr. LeBlanc, Mr. Brown, and Mr. Richard were all terminated on July 31, 1997.
Sleeping on duty was prohibited by Catalyst's policies, a fact of which both Mr. Brown and Mr. LeBlanc were aware. According to the company's disciplinary policies, "deliberately" sleeping on duty was grounds for termination. "Unintentionally" sleeping on duty, if a first offense, was grounds for suspension and if a second offense, grounds for termination. The discharge papers of Mr. Brown, Mr. LeBlanc, and Mr. Richard did not indicate whether their sleeping was "deliberate" or "unintentional." *1162 However, the sleeping incidents of July 30, 1997 were characterized as "intentional," according to Mr. Stafford's testimony, based on factors such as the presence of the men in the break room lounge chairs, the duration of their sleep, and the positions of their bodies. He explained that prior to this incident, no employee had been disciplined, warned, or terminated for sleeping on duty.
Operator Mr. Darby, who had been terminated for failing a drug test, testified that it was common for employees to sleep in the break room and that before plaintiffs, he was unaware of anyone ever being disciplined or reprimanded for such behavior. Mr. Cormier testified that he had seen employees sleeping in the break room many times, nearly every night, and added that Mr. Dautreuil once explained to him that as long as an employee did not exceed his allotted break time, he could sleep if he so chose.
Subsequent to July 30, 1997, four other employees were disciplined for sleeping. Only one of those, Mr. Derise, was terminated. The other three employees, who had all "unintentionally" fallen asleep on their forklifts, were given formal warnings and suspensions, consistent with Catalyst procedures. None of these employees had reported violations to OSHA. The records of these subsequent sleeping events all stated whether the sleep involved was "deliberate" or "unintentional." In the case of Mr. Derise, his discharge papers state that he was terminated for "deliberately" sleeping. The other three employees disciplined for sleeping subsequent to July 30, 1997 were suspended, not terminated, for "unintentional" sleeping.
Prior to his termination, Mr. Brown had been disciplined on three occasions, including a verbal warning, a written reprimand, and a suspension. Mr. LeBlanc had never been disciplined. Both men attended substantial safety and emergency training.
Mr. LeBlanc found another job with his previous employer immediately following his termination from Catalyst. He suffered no wage loss. Mr. Richard secured employment in two weeks. Mr. Brown could not find employment for over two years.
Catalyst alleges that in late 1996 and 1997, Mr. Brown was employed full time by both Catalyst and Cravins Insurance, yet was issued neither W-2 forms nor 1099 forms from the insurance agency for 1997. Mr. Brown claims that he earned nothing from the insurance company that year. In 1998 and 1999, Cravins Insurance issued a 1099 form to Mr. Brown reflecting earnings of $10,000 each year. The agency did not issue W-2 forms to Mr. Brown, yet Catalyst urges that plaintiff received certain checks marked "salary" for each year which exceeded the amounts shown on the 1099 forms. Catalyst alleges that Mr. Brown's 1998 and 1999 federal and state tax returns failed to reflect all income from the insurance company.
On July 27, 1998, Mr. Brown, Mr. LeBlanc, and Mr. Richard filed suit against Catalyst for wrongful termination in retaliation for reporting violations of OSHA confined space regulations pursuant to La. R.S. 30:2027. Mr. Aubrey's previously filed suit was consolidated therewith and the two cases proceeded to bench trial together on February 23, 2000. Catalyst settled with Mr. Aubrey and Mr. Richard. Mr. Brown and Mr. LeBlanc continued to litigate until the trial's conclusion.
The trial judge found that the plaintiffs' discharge had been in violation of La.R.S. 30:2027. Mr. LeBlanc's actual damages for emotional distress were set at $30,000, which damages were trebled pursuant to La.R.S. 30:2027(B). Accordingly, judgment was entered in the amount of *1163 $90,000, together with pre-judgment interest in the amount of $16,206.30. The trial judge further found that Mr. Brown's actual damages for emotional distress were $30,000, and $75,589 for past lost wages. These damages were trebled pursuant to La.R.S. 30:2027(B), rendering judgment in the amount of $316,767.00, together with pre-judgment interest in the amount of $57,040.24. Additionally, Mr. LeBlanc was awarded $35,402.10 in attorneys' fees, and Mr. Brown was awarded $124,602.41 in attorneys' fees. The plaintiffs were also awarded $18,974.83 in costs. This appeal followed.

III.

LAW AND DISCUSSION

Redirect of Mr. Stafford During Catalyst's Case in Chief
At the first phase of trial and as part of their case in chief, plaintiffs called Mr. Stafford as an adverse party witness. Counsel for plaintiffs began with a cross-examination of the witness under the provisions of La.Code Evid. art. 611(C). At the conclusion of cross, defense counsel confirmed with the trial judge that his examination of Mr. Stafford could include subjects covered by plaintiffs' counsel and that he had a right, if necessary, to call Mr. Stafford in defendant's case in chief. The trial judge agreed. Counsel for Catalyst then began his examination of Mr. Stafford. Catalyst presented its case in chief during the second phase of trial, during which Mr. Stafford was called again. Counsel for Catalyst directly examined the witness, followed by a cross-examination by plaintiffs' counsel. Defense counsel then sought to conduct a redirect examination on matters raised during plaintiffs' cross examination. The judge disallowed it, explaining that when Mr. Stafford testified at plaintiffs' case in chief, Catalyst questioned him at length. Catalyst assigns this action of the trial judge as error.
For its position, Catalyst sites La.Code Evid. art. 611(D), which reads:
A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters.
Catalyst argues that this article grants discretion to the trial judge only as to the scope of redirect, not to the ability to redirect.
First of all, we do not believe that Catalyst was denied the ability to redirect Mr. Stafford. When plaintiffs called the witness at the start of their case in chief, they began by cross-examining him. Catalyst's examination that followed was, by definition, essentially a redirect of the witness, since it followed a cross-examination. And, as comment (k) to La.Code Evid. art. 611 explains, "[t]rial judges have considerable discretion to allow or disallow parties to conduct re-redirect and further examination, State v. Mitchell, 290 So.2d 829 (La.1974); State v. Smith, 340 So.2d 247 (La.1976); State v. Byrd, 214 La. 713, 38 So.2d 395 (1949) ...." (emphasis added).
Moreover, according to La.Code Civ.P. art. 1636(A), "[w]hen the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence." Because Catalyst neither made an offer of proof at trial nor proffered the testimony it intended to elicit from Mr. Stafford, it is precluded from then raising the exclusion of evidence as an error on *1164 appeal. Libersat v. J & K Trucking, Inc., XXXX-XXXXX (La.App. 3 Cir. 10/12/00); 772 So.2d 173, writ denied, XXXX-XXXX (La.4/12/01); 789 So.2d 598. Without a proffer of the testimony, there is no evidence available for the appellate court to review. McLean v. Hunter, 495 So.2d 1298 (La.1986); Patton v. Lemoine, 2000-765 (La.App. 3 Cir. 11/2/00); 776 So.2d 513, writ denied, XXXX-XXXX (La.4/12/01); 789 So.2d 591.

Mr. Brown's Past Disciplinary Record
Mr. Brown's prior disciplinary record, which Catalyst regards as both relevant and admissible, includes an April 1993 verbal warning concerning supervision of his crew, a May 1995 written warning about his failure to attend a mandatory training meeting, and an April 1996 suspension for failure to properly supervise his crew. Catalyst argues that such evidence is essential to an employer's ability to prove a legitimate, nonretaliatory reason for termination. While we refrain from determining whether such evidence is essential, we do recognize that prior disciplinary evidence is admissible in some employment cases. See Thomas v. Evangeline Parish Sch. Bd., 98-1458 (La. App. 3 Cir. 3/24/99); 733 So.2d 102, writ denied, 99-1056 (La.6/4/99); 744 So.2d 626; Frye v. Louisiana State Univ. Med. Ctr. In New Orleans, 584 So.2d 259 (La. App. 1 Cir.1991). To be admissible, however, that evidence must be relevant. La. Code Evid. art. 402. Because Mr. Brown's prior disciplinary record was irrelevant in this case, we find that the trial judge's evidentiary rulings on these matters were not an abuse of discretion.
It is important to note, first of all, that Catalyst was allowed to elicit testimony from Mr. Brown regarding his prior disciplinary record. It was only after much of this testimony was complete that the trial judge required defense counsel to proffer the disciplinary documentation and the minimal remainder of the questioning; particularly, defense counsel proffered testimony in connection with the April 1996 suspension for failure to properly supervise his crew as well as evidence of Mr. Brown having filed an EEOC charge following the 1996 suspension. However, even if Catalyst had been required to proffer the entirety of the past disciplinary evidence and accompanying testimony, our opinion would remain unchanged.
Mr. Brown's termination notice reads in pertinent part: "You are being terminated for violation of company policy, specifically, sleeping while on duty, negligence and failure to supervise your employees. You were warned on July 20, 1997 about sleeping while on duty." The only prior incident specifically referenced in the notice was Mr. Brown's July 20, 1997 warning for sleeping on duty. If Catalyst opted to underscore at least one prior disciplinary incident, then we are left to assume that it could have also opted to cite any other prior incidents that factored into the decision to terminate. Because Catalyst did not do so, we are left to assume further that the "sleeping while on duty, negligence and failure to supervise" language references the events of July 31, 1997 exclusively. As such, the citation for "failure to supervise" was not meant to incorporate a reference to the April 1996 suspension. The same reasoning applies to the April 1993 oral warning concerning supervision of his crew and the May 1995 written warning for failure to attend a mandatory training meeting. These prior incidences were irrelevant to Catalyst's decision to terminate.
Catalyst argues that filing the EEOC charge in response to the 1996 suspension evidences a pattern of Mr. Brown's refusal to accept responsibility and his desire to *1165 blame others. We fail to see the connection between the filing of an EEOC charge and a desire to lay blame on others. Moreover, since we find the relevancy ruling regarding the April 1996 suspension to be correct, and because the EEOC charge was allegedly in response to such suspension, the evidence of the EEOC complaint is likewise irrelevant.
With respect to every evidentiary ruling cited by Catalyst, we note that the determination of relevance is within the discretion of the trial judge and because we do not find clear abuse of discretion, his rulings will not be disturbed. Quibodeaux v. Med. Ctr. of S.W. Louisiana, 97-204 (La.App. 3 Cir. 3/6/98); 707 So.2d 1380, writ denied, 98-0926 (La.5/15/98); 719 So.2d 465; Hawthorne v. Hawthorne, 96-89 (La.App. 3 Cir. 5/22/96); 676 So.2d 619, writ denied, 96-1650 (La.10/25/96); 681 So.2d 365.

Mr. Brown's Mitigation of Damages
For the two years following Mr. Brown's termination from Catalyst, his sole source of income derived from his 49% ownership in the Cravins Insurance Company. Mr. Brown was issued neither W-2 forms nor 1099 forms from the insurance agency for 1997. He claims that he earned nothing from the insurance company that year. The testimony of Mr. Brown and the 1099 forms from the insurance company reflect earnings of $10,000 for both 1998 and 1999.
At trial, Catalyst sought to show a number of things, namely, that certain checks marked "salary" issued to Mr. Brown from the insurance company reflected income which exceeded his 1099 form amounts, which was not accounted for in his 1998 and 1999 tax returns, and for which no W-2 was issued; that Mr. Brown had taken cash from his employer and/or its customers that was not reported as income; that Mr. Brown owed Mr. Cravins money; and that Mr. Brown's insurance agent's license had been revoked in 1997. Catalyst argues that the trial judge's relevancy rulings on these matters prevented proper proof of mitigation.
A thorough review of the record reveals that Catalyst was allowed to examine Mr. Brown extensively about his employment relationship with Cravins Insurance. During the course of questioning, the amount of the checks was revealed, as was the fact that they were paid to Mr. Brown, that he received them, and that they were marked "salary." This permitted line of questioning obviated the need to have the checks themselves admitted into evidence although they were proffered. The total value of the checks was therefore in evidence, as was a comparison of that value to Mr. Brown's 1099 form (since a W-2 form was never issued) in order to determine whether he received more income from the insurance company than was reported on the 1099 form. In connection with the checks, Mr. Brown was also questioned about not having been issued W-2 forms.
As to whether Mr. Brown had taken cash from his employer and/or its customers that was not reported as income and as to whether he owed Mr. Cravins money, this was explored through questioning. The court clearly asked, "Mr. Brown, did you take any money out of Donald Cravins' Agency or did you owe Donald Cravins any monies?" Mr. Brown responded, "I did not take any money out of Donald Cravins Insurance Agency, and any monies that I owe him is just based on some advertisement that I did and he covered the expense for it." Catalyst was also allowed to draw forth testimony from Mr. Brown about whether the insurance agency paid any of his personal expenses. Mr. Brown testified that it did not.
*1166 Counsel for Catalyst argued that if Mr. Brown's agent's license was revoked in 1997, then he would be unable to show earnings as an insurance agent. The court disallowed evidence of such. In regard to this and all other relevancy rulings on the subject of mitigation[1], we fail to find a clear abuse of discretion and the rulings will therefore remain undisturbed. Quibodeaux, 707 So.2d 1380; Hawthorne, 676 So.2d 619. The trial court allowed Catalyst to sufficiently explore Mr. Brown's receipt of income from the insurance company.

Proof Under La.R.S. 30:2027
Louisiana is an employment at-will state, and as La.Civ.Code art. 2747 declares: "A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for so doing. The servant is also free to depart without assigning any cause." However, certain legislation has been designed to protect employees from termination for reasons that are against public policy. This case derives from the mandates of La.R.S. 30:2027.[2] This statute protects employees who disclose or threaten to disclose possible environmental violations from retaliatory or adverse action by their employers. The plaintiff-employee bears the burden of showing a causal connection between his good faith disclosure or threat of disclosure of an environmental violation and the alleged retaliatory or adverse action undertaken by his employer in response to such report or complaint. Bear v. Pellerin Const., Inc., XXXX-XXXX *1167 (La.App. 4 Cir. 1/30/02); 806 So.2d 984; Chiro v. Harmony Corp., 99-0453 (La. App. 1 Cir. 11/5/99); 745 So.2d 1198, writ denied, XXXX-XXXX (La.1/28/00); 753 So.2d 840.
[T]he meaning of the phrase `act in a retaliatory manner' in § 2027 requires a showing that the employer was [illicitly] motivated to fire an employee because of the employee's disclosure of an environmental violation. Otherwise, § 2027 would be transformed into a wrongful-discharge statute which covers adverse employment actions that have nothing to do with an employee's disclosure of an environmental violationa result inconsistent with Louisiana's employment at-will doctrine.
Powers v. Vista Chem. Co., 109 F.3d 1089, 1094-95 (5th Cir.1997). See also Bear, 806 So.2d 984. The scope of the statute encompasses the disclosure of violations of federal, state, and local laws. Cheramie v. J. Wayne Plaisance, Inc., 595 So.2d 619 (La.1992).
There are many facts which, taken together, justify the ultimate factual finding that the plaintiffs' termination was pretextual. However, to show the presence of legitimate, nonretaliatory reasons for termination, Catalyst highlights a lack of direct evidence in support of plaintiffs' burden and that the circumstantial evidence weighed in favor of Catalyst. Naturally, Catalyst points to the issue of sleeping on duty. However, plaintiffs demonstrated at trial that sleeping during break time was an accepted practice. In connection with the July 20, 1997 incident, Ms. Duhon reported that Mr. Dautreuil told her that if she were to see the men sleeping again, she should wake them if they slept longer than their allotted break time. Mr. Stafford testified that he thought it was probably true that this was the first time in the history of the plant that an employee had been reprimanded for sleeping on duty.
Then, on July 30, plaintiffs were photographed while, according to Catalyst, they "deliberately" slept on duty, in violation of their employer's written policies prohibiting such behavior. Plaintiffs had knowledge of these policies and had recently been counseled regarding the July 20 sleeping episode. However, Mr. Stafford testified that prior to this incident, no employee had been disciplined, warned, or terminated for sleeping on duty. Mr. Darby testified that it was common for employees to sleep in the break room and that before plaintiffs, he was unaware of anyone ever being disciplined or reprimanded for such behavior. Mr. Cormier testified that he had seen employees sleeping in the break room many times, nearly every night, and added that Mr. Dautreuil once explained to him that as long as an employee did not exceed his allotted break time, he could sleep if he so chose. Even if Catalyst had a reason for terminating plaintiffs, their discharge remains retaliatory if that reason was pretextual. See Ducote v. J.A. Jones Constr. Co., 471 So.2d 704 (La.1985); N.L.R.B. v. Adco Elec. Inc., 6 F.3d 1110 (5th Cir.1993).
We take issue with the arbitrary nature of the company's disciplinary policies, particularly the distinction between "deliberately" and "unintentionally" sleeping. Though records of subsequent employee sleeping incidents all state whether the sleep involved was "deliberate" or "unintentional," the discharge papers of Mr. Brown, Mr. LeBlanc, and Mr. Richard made no such indication. Subsequent to July 30, 1997, four other employees had been disciplined for sleeping. Only one of those, Mr. Derise, was terminated. The other three employees, who had all "unintentionally" fallen asleep on their forklifts, were given formal warnings and *1168 suspensions. A showing that none of these employees had reported violations to OSHA supports a finding of retaliatory discharge of plaintiffs.
In further support of its position, Catalyst points to Mr. Brackin, who had not been asleep and was not terminated. Mr. Jeff Jackson had been asleep, and was terminated despite not having complained of confined space violations. However, the trial judge chose not to lend much weight to this fact, perhaps because Mr. Jackson was a probationary employee and a recent hire without a substantial history with Catalyst. During the week that plaintiffs were fired, Mr. Jackson was standing in for Mr. Anthony Monroe, who usually worked on plaintiffs' crew. Mr. Monroe, who had submitted a statement to OSHA, was not on duty the night of July 31 and therefore not sleeping that night. He was not terminated and was eventually promoted to crew supervisor, a position held by Mr. Brown prior to his termination. Catalyst submits that this clearly suggests a motivation to terminate based upon sleeping and not upon having reported confined space violations. However, Mr. Monroe did not testify against Catalyst at Mr. Aubrey's unemployment hearing. Every Catalyst employee who did testify was terminated, including Mr. Youngs, Mr. Richard, Mr. LeBlanc, and Mr. Brown.
Plaintiffs submitted statements to OSHA in August 1996, and Catalyst points out that both men received pay raises in March 1997. However, Catalyst did not learn of the statements to OSHA until Mr. Aubrey's April 1997 unemployment hearing, one month after the raises were administered. Mr. Stafford testified that he did not know that the plaintiffs contacted OSHA until the April unemployment hearing. Moreover, the raises were not given to plaintiffs exclusivelythey were given to all employees within a certain job category.
Additional facts further justify the conclusions of the trial court. Mr. Brown and Mr. Aubrey testified that the April and July 1996 safety meetings did not prompt any member of the Catalyst management to investigate confined space concerns. Mr. Darby testified that prior to August 1996, Catalyst rarely complied with the confined space requirements of a hole watch and permit and Mr. Cormier testified that he did not even know what a confined space permit was. Mr. Aubrey testified that on August 15, 1996, Mr. Derise twice ordered him to enter and perform a clean-out on Unit IV without the required permit and hole watch. Mr. Aubrey suffered physically as a result. He opined that refusing reentry would have amounted to an act of insubordination and that he was fearful of losing his job. Mr. Aubrey was suspended from work following an investigation by Mr. Stafford, but no investigation was launched into Mr. Richard's confined space violation of that same night. A reasonable trier of fact could view these facts as evidencing Catalyst's general lack of regard for OSHA regulations.
In addition to evidence of attempts to veil its lack of regard for certain regulations, the events following Mr. Aubrey's suspension could reasonably be viewed as evidence of Catalyst's retaliatory tendencies. On August 21, 1996, Mr. Aubrey contacted OSHA, and on August 23, he was terminated for violating company policy. Mr. Youngs testified that Mr. Stafford asked him to issue a new written statement to OSHA, wherein he was to explain that Mr. Derise had no knowledge that Mr. Aubrey planned to enter the unit without either a permit or a hole watch. When Mr. Youngs eventually contacted OSHA and gave a second, original statement, *1169 OSHA commenced a second investigation. Mr. Brown and Mr. LeBlanc were among those interviewed. They all reported to OSHA that they knew of employees who had been required to enter a permit required confined space without a permit or without a hole watch. Also, they all stated that they had a certain degree of fear of losing their jobs if they spoke to or discussed any such violations with OSHA. On July 29, Mr. Derise was served with a copy of Mr. Aubrey's wrongful discharge lawsuit. That night, Mr. Brown and Mr. LeBlanc and others were photographed sleeping and sent home pending an investigation.
When the findings of fact are viewed as a whole, we think it reasonable to conclude that Catalyst was illicitly motivated to fire Mr. Brown and Mr. LeBlanc not for having slept at work, but because they reported certain OSHA violations. Our decision is based primarily, though not exclusively, on what we regard as Catalyst's disregard for confined space entry violations, its attempts to conceal such, and its general tolerance for sleeping on duty. Because there is evidentiary support in the record for the trial court's conclusions, they are not manifestly erroneous. This support includes the foregoing findings of facts as well as the application thereof to plaintiffs' burden existent under La.R.S. 30:2027.

Mr. LeBlanc's Emotion Distress Damages
Within days of his termination from Catalyst, Mr. LeBlanc returned to his pre-Catalyst employment with Greene's Pressure Testing. He suffered no wage loss. Mr. LeBlanc's actual damages for emotional distress were set at $30,000, which damages were trebled pursuant to La.R.S. 30:2027(B), together with pre-judgment interest.
The defendant denies a basis for Mr. LeBlanc's award. There was no pattern of harassment endured by the plaintiff at Catalyst, and that subsequent to his termination, he continued to live in the same home and drive the same car. He saw no medical health professional in connection with his termination. He claimed that on the day of termination, he became emotionally distressed upon returning home to face his wife and children. However, Catalyst argues that his 1997 and 1998 tax returns indicate that he was not married at the time of his termination and that one of his two children lived elsewhere with his former wife. Despite Catalyst's arguments, we do not find error with the trial court's rendition of damages. Mr. LeBlanc testified that he was married and living with his wife and two children at the time of his discharge. He explained that he and his wife had separated then reunited, though he could not recall specific dates.
Mr. LeBlanc was employed with Catalyst for 13 years and maintained an untarnished employment record. Dr. John Grimes, vocational expert, testified at trial that the impact of termination is among the top ten stressors. He explained that the longer the period of employment, the greater the stress suffered at its termination. This stress does not necessarily diminish when the individual is quickly reemployed. Mr. LeBlanc testified that his family life suffered considerably following his discharge from Catalyst, when he had to return to a job that required offshore labor. Dr. Grimes testified that had Mr. LeBlanc sought employment closer to home, he would have suffered a reduction in pay.
"[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of *1170 the discretion by the trier of fact ... [T]he adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993). In light of the foregoing facts, we do not find that the emotional distress damage amounts to a clear abuse of the trial judge's discretion. Reference to other awards in similar cases would therefore be inappropriate. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).

Award of Attorney Fees
Mr. LeBlanc was awarded $35,402.10 in attorney fees, and Mr. Brown was awarded $124,602.41. Catalyst argues that these awards were administered on a mere contingency basis, and that the trial court did not analyze the factors most often considered in determination of an award of attorney fees, namely, the ultimate result obtained; responsibility incurred; the importance of the litigation; the amount involved; the extent and character of the labor performed; the legal knowledge and attainment and skill of the attorney; the number of appearances made; the intricacies of the facts and law involved; the diligence and skill of counsel; the court's own knowledge; and the ability of the party liable to pay. D.O.T.D. v. Williamson, 597 So.2d 439 (La.1992). "An award of attorney fees is based [in part] on... the percentage fixed for attorney fees in plaintiffs contract with his attorney, if based on a contingency." Brown v. Navarre Chevrolet, Inc., 610 So.2d 165, 172 (La.App. 3 Cir.1992); Rules of Professional Conduct, Rule 1.5(a). The award is, Catalyst argues, in conflict with the jurisprudence and with the Rules of Professional Conduct providing for reasonableness of the fee.
The trial court determined that one-third of the recovery was an appropriate fee. We find that this determination was based upon all relevant factors, including but not limited to the attorney fees contract. See Malbrough v. Wallace, 594 So.2d 428 (La.App. 1 Cir.1991), writ denied, 596 So.2d 196 (La.1992) (where the court reduced the attorney fees of two-thirds the award to one-third). Included in the record is plaintiffs' contingency fee contract, a summary of time and money invested in the case, and evidence of counsel's experience. The trial judge's award does not represent an abuse of discretion and, therefore, will not be modified. Gravolet v. Bd. of Comm'rs for the Grand Prairie Levee Dist., 95-2477 (La.App. 4 Cir. 6/12/96); 676 So.2d 199.

Award of Costs
The plaintiffs were awarded $18,974.83 in costs. Particularly, Catalyst argues that neither costs of depositions not introduced at trial, nor travel costs associated with taking depositions, can be part of the cost assessment. Catalyst sites La. R.S. 13:4533, which explains that "[t]he costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs." Application of La.R.S. 13:4533, according to Catalyst, would yield a proper cost award of $4,187.25. However, La.R.S. 30:2027(B)(1) says that "[a]ny employee... shall recover from his employer ... all costs of preparing, filing, prosecuting, appealing, or otherwise conducting a law suit...." Costs of depositions not introduced at trial and travel costs associated with taking depositions can properly be categorized as costs incurred in "conducting a law suit." Due to the nature of the behavior it was designed to deter, we find that the intent of La.R.S. 30:2027 encompasses *1171 a broader mandate than La.R.S. 13:4533, the general cost statute.

Trebled Interest
According to La.R.S. (B)(1), "[a]ny employee... shall recover from his employer triple damages resulting from the action taken against him and all costs of preparing, filing, prosecuting, appealing, or otherwise conducting a law suit, including attorney's fees...." At the time this lawsuit arose, Subsection (B)(2)(b) read in part that damages "shall include, but not be limited to, lost wages, lost anticipated wage due to wage increase, or loss of anticipated wages which would have resulted from a lost promotion, any property lost as a result of lost wages, lost benefits, and any physical or emotional damages resulting therefrom."
As we read the statute, attorney fees and costs are not to be trebled. Damages, however, are trebled. Catalyst argues that there is no statutory basis for a claim of trebled interest on that damage award and that the trial court erred in granting interest thereon. We disagree. Though there is no mention of interest in La.R.S. 30:2027, La.R.S. 13:4203 clearly says that "[l]egal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts." See also La.Civ.Code art. 2924(B)(1). In this case, the trebled damage award was a rendered judgment sounding in damages. Interest, therefore, properly attached and the trial court's calculation thereof was proper.

IV.

CONCLUSION
For the reasons assigned, the judgment appealed from is affirmed. All costs are assessed against Catalyst Recovery of Louisiana, Inc.
AFFIRMED.
NOTES
[1] Though we address the question of mitigation of damages as posed by Catalyst, we do not mean to suggest that mitigation of damages is proper within the context of at will employment. That issue is not before us.
[2] A. No firm, business, private or public corporation, partnership, individual employer, or federal, state, or local governmental agency shall act in a retaliatory manner against an employee, acting in good faith, who does any of the following:

(1) Discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation.
(2) Provides information to, or testifies before any public body conducting an investigation, hearing, or inquiry into any environmental violation by the employer, or another employer with whom there is a business relationship, of an environmental law, rule, or regulation.
B. (1) Any employee against whom any action is taken as a result of acting under Subsection A of this Section may commence a civil action in a district court of the employee's parish of domicile, and shall recover from his employer triple damages resulting from the action taken against him and all costs of preparing, filing, prosecuting, appealing, or otherwise conducting a law suit, including attorney's fees, if the court finds that Subsection A of this Section has been violated. In addition, the employee shall be entitled to all other civil and criminal remedies available under any other state, federal, or local law.
(2)(a) The term "action is taken" shall include firing, layoff, lockout, loss of promotion, loss of raise, loss of present position, loss of job duties or responsibilities, imposition of onerous duties or responsibilities, or any other action or inaction the court finds was taken as a result of a report of an environmental violation.
(b) "Damages" for the purposes of this Section shall include, but not be limited to, lost wages, lost anticipated wage due to wage increase, or loss of anticipated wages which would have resulted from a lost promotion, any property lost as a result of lost wages, lost benefits, and any physical or emotional damages resulting therefrom [ (B)(2)(b) now reads differently pursuant to its 1999 amendment].
C. This Section shall have no application to any employee who, acting without direction from his employer or his agent, deliberately violates any provision of this Subtitle or of the regulations, or permit or license terms and conditions in pursuance thereof.